MHN

IN THE U.S. COURT OF APPEALS FOR THE SEVENTH CIRCUIT

AND

PETITION FOR WRIT OF HABEAS CORPUS
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

28 USC 2241

PERSONS IN FEDERAL CUSTODY
EMERGENCY APPLICATION

**RECEIVED**

JUL 21 2008
JUL 21 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

U.S.C.A. – 7th Circuit
**RECEIVED**

JUL 21 2008 DDS

GINO J. AGNELLO
CLERK

ANTHONY ROBINSON 19209-424
(Full name and prison number)
(Include name under which convicted)
PETITIONER

)
)
)
)
)

**08CV4174**
**JUDGE KENDALL**
**MAGISTRATE JUDGE COLE**

vs.

ERIC WILSON
(Name of Warden, Superintendent,
Jailor, or authorized person having
custody of petitioner)
RESPONDENT

)
)
)
)

If petitioner is serving a sentence under a federal judgment which
he wishes to attack, he should file a motion under 28 USC § 2255,
in the federal court which entered the judgment.

EMERGENCY APPLICATION FOR WRIT OF HABEAS CORPUS

No XEROX AVAILABLE (PETITION ATTACHED)

1

## PETITION

1. Name and location of court which entered the judgment of conviction under attack _____N/A_____

2. Date of judgment of conviction _____

3. Length of sentence _____

4. Nature of offense involved (all counts with indictment number of each, if known) _____

_____N/A_____

_____

5. What was your plea?  (Check One)
   (A)  Not guilty                    (✓)
   (B)  Guilty                        (  )
   (C)  Nolo contendere               (  )

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

   _____NOT APPLICABLE_____

   _____

6. Kind of trial:  (Check One)
   (A)  Jury                          (✓)
   (B)  Judge only                    (  )

7. Did you testify at trial?

   YES  (✓)              NO  (  )

8. Did you appeal from the judgment of conviction or imposition of sentence?

   YES  (  )              NO  (✓)

   (A)  If you did appeal, answer the following:

        (1)  Name of court  _____No Appeal_____

        (2)  Result  _____

2

    (3)   Date of result  _____

    (4)   Issues raised  _____

_____

9.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions pursuant to 28 USC § 2255 with respect to this judgment in any federal court?

                          YES ( )    NO ( ✓ )

10.  If your answer to question (9) was **YES**, give the following information:

  (A)  (1)  Name of court  _____

       (2)  Nature of proceeding  _____

_____

     (3)  Grounds raised  _____

NOT APPLICABLE

_____

_____

     (4)  Did you receive and evidentiary hearing on your petition, application, or motion?

                   YES ( )    NO ( )

     (5)  Result  _____

     (6)  Date of result  _____

  (B)  As to any second petition, application, or motion, give the same information.

     (1)  Name of court  _____

     (2)  Nature of proceeding  _____

_____

     (3)  Grounds raised  _____

_____

3

(4) Did you receive and evidentiary hearing on your petition, application, or motion?

YES ( )   NO ( )

(5) Result _____

(6) Date of result _____

(C) As to any third petition, application, or motion, give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

_____

(3) Grounds raised _____

_____ SEE ATTACHED PETITION

(4) Did you receive and evidentiary hearing on your petition, application, or motion?

YES ( )   NO ( )

(5) Result _____

(6) Date of result _____

(D) Did you appeal the result to the federal appellate court having jurisdiction?

(1) First petition, etc.    YES ( )   NO ( )
(2) Second petition, etc.   YES ( )   NO ( )
(3) Third petition, etc.    YES ( )   NO ( )

(E) If you did <u>not</u> appeal from the adverse action on any petition, application, or motion, explain briefly why you did not:

_____

_____

_____

4

11. If you did not file a motion under Section 2255 of Title 28 United States Codes, or if you filed such motion and it was denied, state why your remedy by way of such motion is inadequate or ineffective to test the legality of your detention:

_SEE ATTACHED_

12. State **concisely** every ground on which you claim that you are being held unlawfully. Summarize **briefly** the **facts** supporting each ground. If necessary, you may attach pages stating additional grounds and **facts** supporting same. You should raise in this petition all available grounds for relief which relate to the conviction under attack. Failure to do so may bar you from presenting additional grounds at a later date.

(A) Ground one _____
    Supporting **FACTS** (tell your story **briefly** without citing cases or law):

5

_____

_____

_____

_____

_____

_____

**(B) Ground two:** _____
    **Supporting FACTS (tell your story briefly without citing cases
    or law):**

_____

_____

SEE ATTACHED

_____

_____

_____

_____

_____

_____

**(C) Ground three:** _____
    **Supporting FACTS (tell your story briefly without citing cases
    or law):**

_____

_____

(G)  On appeal from any adverse ruling in a post-conviction proceeding _____

17.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
YES ( )  NO ( )

18.  Do you have any future sentence to serve after you complete the sentence imposed by judgment under attack?
YES ( )  NO ( )

(A)  If YES, give the name and location of the court which imposed sentence to be served in the future:

_____

(B)  And give the date and length of sentence to be served in the future _____

WHEREFORE, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

_____          _____
Signature of attorney (if any)      Signature of petitioner

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on  7/14/08
(Date)

_____
(Signature of petitioner)

_____
(Mailing address for petitioner)
71 West Van BaiBuren
St.
Chicago, IL 60605

9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY ROBINSON,
      PETITIONER,

                        CASE No. _____

VS.

ERIC WILSON, WARDEN
      RESPONDENT

EMERGENCY APPLICATION FOR WRIT OF
WABEAS CORPUS

I. JURISDICTION!

    1) JURISDICTION IS INVOKED PURSUANT TO

TITLE 28 U.S.C. § 2241 (c)(3) & 2243

    3) A 3 DAY RETURN IS DEMANDED DUE TO

THE BLATENT ILLEGALITY OF PETITIONER'S UNLAWFUL

DETENTION IN VIOLATION OF LAWS & CONSTITUTION.

3) Petitioner is also confined in violation of Title 18 USC § 666 (C) which states in part

"THIS SECTION DOES NOT APPLY TO BONA FIDE SALARY, WAGES, FEES ....... IN THE USUAL COURSE OF BUSINESS" QUOTE- UN QUOTE 18 USC § 666 (C) (EMPHASIS ADDED).

II. Venue:
    4) All violations occurred in this judicial district

III. Statement of Facts & Evidence:

    5) Cut & Dry this Petitioner was flim-flammed April 22, 23, 2008 in the case of U.S. v. Robinson, 06 CR 850 in this district.

    6) It is clear from the attached

TRANSCRIPT OF TESTIMONY THAT PETITIONER
WAS FOUND GUILTY BASED UPON WAGES &
SALARY OF CHICAGO POLICE OFFICERS —
CONTRARY TO TITLE 18 USC 666 (c).
SEE TT PAGES 75 THRU 86 ATTACHED.

7) BECAUSE INDISPENSIBLE ELEMENT OF
ALLEGED CRIME WAS THE USED OF WAGES IN
CONTRA OF SECTION (c) OF §666, THE PETITIONER
IS UNLAWFULLY HELD.

8) BECAUSE COUNSEL WAS SO BLATENTLY
INEFFECTIVE, PETITIONER SHOULD BE GRANTED
HABEAT CORPUS. SEE U.S. v. NARLOCK 815 F SUPP
618 (1993).

9) PETITIONER WAT ILLEGALLY CONVICTED
BASED UPON TRANSCRIPTS ATTACHED.

— 12 —

10) THE U.S. DISTRICT COURT WAS WITHOUT JURISDICTION BECAUSE THE GOVERNMENT FAILED TO MEET ITS BURDEN WITH REGARDS TO $5000 JURISDICTIONAL AMOUNT AS REQUIRED BY 18 USC § 666 (a)(2), AND USED BONA FIDE SALARY, WAGES OF CHICAGO POLICE OFFICERS

CONCLUSION

THE PETITIONER'S HABEAS CORPUS MUST BE GRANTED

RESPECTFULLY SUBMITTED,

JULY 15, 2008

ANTHONY ROBINSON
71 W. VAN BUREN ST
CHICAGO, IL 60605

— 13 —

1) Petitioner is Also Confined in

Violation of title 18 USC § 666 (a) which

States

   " Whoever, if the Circumstance
described in subsection (b) of this section
exists

   Which States in part

   " Agency receives, in any one year
period, benefits in excess of $10,000
under a federal program involving
a grant"

II Venue:
   2) All violations occurred in this
Judicial District

III  Statement of facts & Evidence

   3) The Government did not
meet the Jurisdictional Requirements
in the case of U.S. V. Robinson, 06 CR
850 in this District.

   4) It is clear from the Indictment

that the government had to prove that

- 14 -

The Chicago Police Department received in excess of $10,000 in federal funding in a twelve-month period from June 1, 2005 to May 31, 2006.

Transcript of testimony that petitioner was found guilty Based on the "City of Chicago" receiving federal funding (
(which has 24 Departments)

Contrary to the Superseding Indictment, filed May 10, 2007. Which states in part: "With the Chicago Police Department being an agency that received in excess of $10,000 in federal funding in a twelve-month period from June 1, 2005 to May 31, 2006

-15-

See Indictment and Trial

Transcripts pages 87 to 102

5 ⓐ Because NO ONE TesTifyed

that the Chicago Police Department

Received in excess of $10,000 in

federal funds

    ⓑ Nor to the amount of funds

received by the Chicago Police Depart-

ment

    ⓒ OR ANy funds where trans-

fered at all to the Chicago Police

Department, In a twelve-month

period from June 1, 2005 to May 31, 2006

U.S. V. Stewart 727 F. Supp 1068
(1989)

U.S. V. WeBB 691 F. Supp 1164 (1988)

-16-

Because of indispensible elements
of alleged crime was ~~the~~ use of the
"City of Chicago" receiving federal funds
Contra ~~the~~ To The Superseding Indictment
That the Chicago Police Department
Received an excess of $10,000 in federal
funding in a twelve-month period.
from June 1, 2005 to May 31, 2006.
The Petitioner is unlawfully Held.
6 #) Petitioner was illegally Convicted
Based upon transcripts Attached
7 #) The U.S. District Court was
Without Jurisdiction Because the
Government failed to meet it's burden
With Regards to the $10,000 Jurisdictional
amount as required by 18 U.S.C. $666 (a)(2)

-17-

# FILED

MAY 1 0 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | **JUDGE JOHN W. DARRAH** |
| ) | No.   06 CR 850 |
| v.              . ) | |
| ) | Violations: Title 18, United States |
| ) | Code, Section 666(a)(2) and Title 21, |
| ANTHONY ROBINSON, ) | United States Code, Section 846 |
| also known as, "Black Ant" ) | |
| ) | **SUPERSEDING** |
| ) | **INDICTMENT** |

**MAGISTRATE JUDGE NOLAN**

### COUNT ONE

The SPECIAL DECEMBER 2005 GRAND JURY charges:

1.    At times material to this indictment:

a.    The City of Chicago (the "City") was a unit of local government known as a municipal corporation, and a political subdivision of the State of Illinois.  The functions and services provided by the City on behalf of its residents were coordinated through various agencies and departments.

b.    The Chicago Police Department was the principal law enforcement agency of the City.  The Chicago Police Department's duties included the enforcement of State and local laws within the City relating to the unlawful possession, manufacture and distribution of controlled substances, including but not limited to marihuana, cocaine and heroin (collectively, "State narcotics laws"). The Chicago Police Department's law enforcement functions were performed by more

than approximately 13,000 police officers.

c.    Individual A was a police officer employed by the Chicago Police Department as a tactical officer who was assigned to the second district and detailed to the Organized Crime Division, Narcotics and Gangs Investigation Section. In this capacity, Individual A was responsible for enforcing State narcotics laws in the City, including within the second police district, a geographic area within the City. Included within the second police district was the Washington Park Homes, a residential development that was located in the area bounded by 45th and 46th Streets to the north and south, and Evans Avenue and Champlain Avenue on the east and west, and areas in the vicinity of the Washington Park Homes, including but not limited to the area around 47th Street and Vincennes Avenue (these areas are collectively referred to herein as the "Washington Park Homes Area").

d.    Individual A, acting in an undercover capacity, pretended to be a corrupt police officer who was willing to receive cash payments in return for reporting on and taking official action within the Washington Park Homes Area, including but not limited to advising narcotics traffickers of law enforcement activity, redirecting law enforcement activity away from narcotics operations, and supplying quantities of controlled substances seized by the Chicago Police Department.

2

2.    From on or about March 23, 2006 through on or about May 3, 2006, at Chicago, in the Northern District of Illinois, Eastern Division,

ANTHONY ROBINSON, also known as,
"Black Ant,"

defendant herein, corruptly gave, offered and agreed to give things of value to a person, namely, **cash payments to Individual A**, with the intent to influence and reward Individual A in his capacity as an agent of the Chicago Police Department, in connection with the business, a transaction, and a series of transactions of the Chicago Police Department involving a thing of value of $5,000 or more, namely, the Chicago Police Department's enforcement of State narcotics laws in and around the Washington Park Homes Area, with the Chicago Police Department being an agency that received in excess of $10,000 in federal funding in a twelve-month period from June 1, 2005 to May 31, 2006,

In violation of Title 18, United States Code, Section 666(a)(2).

3

## COUNT TWO

The SPECIAL DECEMBER 2005 GRAND JURY further charges:

On or about May 3, 2006, at Chicago, in the Northern District of Illinois, Eastern Division,

### ANTHONY ROBINSON, also known as, "Black Ant,"

defendant herein, attempted to knowingly and intentionally possess with intent to distribute a controlled substance, namely, in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

In violation of Title 21, United States Code, Section 846.

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY

4

Bailey - direct

THE COURT:  Speak into that microphone, Ms. Bailey.

THE WITNESS:  Yes.

THE COURT:  You may inquire, Mr. McFadden.

MR. MC FADDEN:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. MC FADDEN:

Q.  Ms. Bailey, could you state your name in a loud, clear voice for the jury and spell it?

A.  Dionne Bailey.

Q.  Could you spell it please for the court reporter?

A.  D-I-O-N-N-E, B-A-I-L-E-Y.

Q.  Ms. Bailey, who is your employer?

A.  City of Chicago Police Department.

Q.  Do you work for a certain section of the police department?

A.  Finance, payroll section.

Q.  And how long have you worked in the payroll section?

A.  The city, since -- for 23 years.

Q.  Okay.  And you have been in the payroll section for a number of those years?

A.  Yes.

Q.  From day-to-day what are the typical duties that you perform during your job in the payroll section?

A.  Grievance settlements, calculating back pay, salary adjustments, records involving salary and payroll.

Bailey - direct

1    Q.    Do all of these records relate to the salaries and

2    payroll for Chicago Police Department officers?

3    A.    Yes.

4    Q.    As it comes to what Chicago officers are paid in terms

5    of salary, are those amounts kept track of in a computer

6    database?

7    A.    Yes.

8    Q.    Do you have access to that database?

9    A.    Yes.

10    Q.    What is the name of it?

11    A.    CHIPPS system.

12    Q.    Is that like potato chips?

13    A.    C-H-I-P-P-S.

14    Q.    Is the City of Chicago under a duty to maintain the data

15    in that system accurately?

16    A.    Yes.

17    Q.    Based on your experience in payroll, I have a couple

18    questions about how often officers are paid.  Do you know how

19    often CPD officers are paid per month?

20    A.    Semi-monthly payroll.

21    Q.    Are they paid on particular days of the month?

22    A.    Yes.

23    Q.    What are those days?

24    A.    The main payrolls are the 1st and the 16th of the month.

25    Q.    Are they paid a salary?

1   A.   Yes.

2   Q.   And in addition to their wages, can they also be paid

3   things like overtime pay or duty availability pay?

4   A.   Correct.   Those are supplement pays.

5   Q.   Just because people might not know, what is duty

6   availability pay, ma'am?

7   A.   In general, it's just pay for being available 24/7.

8   Q.   Before your testimony today, did you determine the wages

9   paid to five Chicago Police Department officers during the

10   time period in 2006?

11   A.   Yes.

12   Q.   And were the names of those officers James Weyforth,

13   Garrick Turner, Diego DaVila, Kevin Williams and George

14   Karuntzos?

15   A.   Yes.

16   Q.   Okay.   And over what time period did you calculate their

17   wages?

18   A.   March 23, 2006, through May 3, 2006.

19   Q.   Okay.   I'm going to --

20        MR. MC FADDEN:   If I could approach the witness,

21   your Honor?

22        THE COURT:   Yes.

23   BY MR. MC FADDEN:

24   Q.   Ms. Bailey, I'm going to hand you what's been marked as

25   Government Exhibit Payroll Records, and if you could take a

1   look at that and let me know if you recognize that exhibit?

2   A.   Yes, I do recognize it.

3   Q.   How do you recognize that exhibit, ma'am?

4   A.   It's police department records.

5   Q.   Did you personally generate the documents that are part

6   of that exhibit?

7   A.   Yes, I did generate this.

8   Q.   Okay.  And just from the way that it looks, did you

9   generate these using the computer system that we were talking

10  about, the CHIPPS system?

11  A.   Yes, I did.

12  Q.   On each of these pages, is this how the computer screen

13  would look when you generated those records, ma'am?

14  A.   Yes, it is.

15  Q.   When it comes to these records, in terms of -- do these

16  records memorialize the wages and the pay that was paid to

17  these police officers that we were talking about?

18  A.   I'm sorry, I didn't hear.

19  Q.   This exhibit that you generated, what does it reflect,

20  ma'am?

21  A.   This is a statement of earnings, yeah.  It would reflect

22  something comparable to a pay stub.

23  Q.   Okay.  And the data that's in here, would it have been

24  entered back in 2006, around the time that the officers

25  worked those hours?

Bailey - direct

1   A.   Yes.

2   Q.   And the people who entered that information, were they

3   under a duty to enter it accurately?

4   A.   Yes.

5   Q.   Was it entered in the regular course of business and

6   maintained in the regular course of business?

7   A.   Yes.

8        MR. MC FADDEN:  Your Honor, I move to admit the

9   exhibit, Government's Exhibit Payroll Records.

10       THE COURT:  Mr. Clark?

11       MR. CLARK:  No objection.

12       THE COURT:  That exhibit is admitted.

13   (Said exhibit was received into evidence.)

14  BY MR. MC FADDEN:

15  Q.   Ms. Bailey, we won't necessarily go through every page,

16  but I would just like to direct your attention to the first

17  page, which is in the -- in the bottom right-hand corner it's

18  mark 558.  What does this first page represent, ma'am?

19  A.   The statement of earnings for James Weyforth for the

20  period 16-31 March, 2006.

21  Q.   It's March 16th to what period?

22  A.   Through March 31st.

23  Q.   Okay.  So is that one pay period?

24  A.   Yes, that would be one whole --

25  Q.   Let me direct your attention over towards the right-hand

Bailey - direct

1    side, top of that exhibit, where it says base salary.  Could

2    you read that number to the jury?

3    A.    $5,772.50.

4    Q.    And what do you understand base salary to mean?

5    A.    This is his -- reflects his monthly salary.

6    Q.    Okay.  And then we come down on the left-hand side,

7    towards the bottom.  It says summaries.  Do you see that?

8    A.    Yes.

9    Q.    Does it say gross pay?

10   A.    Yes.

11   Q.    And is there a number there?

12   A.    Yes.

13   Q.    What is that number for this time period of March 16th

14   to March 31st of 2006?

15   A.    $2,886.25.

16   Q.    And further down, where it says net pay, what does net

17   pay signify?

18   A.    After deductions.

19   Q.    Okay.  And the deductions include things like taxes and

20   things like that.

21             And what is the net pay for this two-week pay

22   period?

23   A.    $899.38.

24   Q.    Ms. Bailey, if you could just flip from Page 558 all the

25   way through to Page 564, does each one of those pages

1    represent a two-week time period and the wages that were paid

2    to Officer Weyforth during each of those two-week time

3    periods?

4    A.    Yes.

5    Q.    And his base salary for each of those monthly periods,

6    did it remain the same?  In other words, $5,772.50 a month?

7    A.    Yes, it did.

8    Q.    Let me direct your attention to Page 565.  Who is the

9    employee listed on that page?

10    A.    Diego DaVila.

11    Q.    And what is his base salary?

12    A.    $5,772.50.

13    Q.    So does that mean during this time period -- was that --

14    is that what he was paid every month as well?

15    A.    Yes, that was his salary.

16    Q.    And does that remain the same as we flip through it for

17    Officer DaVila -- does that remain the same all the way up to

18    Page 570?

19    A.    Yes, it does.

20    Q.    Whose records begin on Page 571?

21    A.    Garrick Turner.

22    Q.    And does that also list his monthly base salary?

23    A.    Yes, it does.

24    Q.    What was his monthly base salary during this time

25    period?

82

```
1    A.    $5,973.50.

2    Q.    And if you would flip all the way through -- up through

3    Page 577.  Did Detective Turner's salary remain the same

4    during that time period?  In other words, $5,973.50 a month?

5    A.    Yes, it did.

6    Q.    Who is the employee whose records begin on Page 578 of

7    this exhibit?

8    A.    George Karuntzos.

9    Q.    And what is his base salary?

10   A.    $6,934.50.

11   Q.    And does his salary -- if we flip through -- up to

12   Page 583, does his base salary remain the same per month?

13   A.    Yes, it does.

14   Q.    And the last name on the list, is that Kevin Williams?

15   A.    Yes, it is.

16   Q.    And what is his base salary during this time period?

17   A.    $5,973.50.

18   Q.    Did that remain the same during this entire time period,

19   ma'am?

20   A.    Yes, it does.

21            MR. MC FADDEN:  Your Honor, if I haven't -- I

22   believe I moved to admit the exhibit.  If I haven't, I just

23   move to do that.

24            MR. BHACHU:  It's admitted.

25            THE COURT:  That exhibit is in evidence.
```

1    MR. MC FADDEN:  Okay.  Thank you.

2    I have no further questions, your Honor.

3    THE COURT:  Any cross, Mr. Clark?

4    MR. CLARK:  A little.

5                    CROSS EXAMINATION

6    BY MR. CLARK:

7    Q.   You actually prepared another document for purposes of

8    coming here today, did you not, a summary of the payroll

9    records?

10   A.   Yes.

11   Q.   Do you have that with you right now?

12   A.   Yes.

13   Q.   In front of you?

14   A.   Yes.

15   Q.   Could I take a look at it, please?

16   A.   Sure.  My copy is marked up.

17          MR. BHACHU:  Here you go.

18      (Document tendered.)

19   BY MR. CLARK:

20   Q.   And that document shows what the --

21          THE COURT:  Hold on a second.

22          MR. CLARK:  I'm sorry?

23          THE COURT:  You want to put that into evidence?

24          MR. CLARK:  I do, I do.  This is -- the first time

25   I've seen this is right now, so --

Bailey - cross

1          THE COURT:  Do you want to move the admission of

2  that exhibit?

3          MR. CLARK:  I do, but I'll lay a foundation for it

4  first.

5          THE COURT:  Is there a necessity for that, Mr. --

6  what do you want to call that, Mr. Clark?

7          MR. MC FADDEN:  That's fine.

8          MR. CLARK:  Defendant's -- I prefer exhibits in the

9  number form.  Exhibit 1, your Honor.

10         THE COURT:  Okay.

11         And you're moving the admission of that?

12         MR. CLARK:  I am.

13         THE COURT:  That's admitted without objection.

14    (Said exhibit was received into evidence.)

15  BY MR. CLARK:

16  Q.    You have a copy of this, do you not?

17  A.    Yes.

18  Q.    And you prepared this for purposes of this case, is that

19  right?

20  A.    Yes, correct.

21  Q.    And this would reflect the payments paid these officers

22  in the case that's here today, is that right?

23  A.    That's my understanding, yes.

24  Q.    So that for -- and this is the defendant, Anthony

25  Robinson.  I don't expect you to know that, but it is.

Bailey - CROSS

1        So for the case against Anthony Robinson, Officer
2    Weyforth has been paid $12,857.75, is that right?
3            MR. BHACHU:  Objection; foundation.
4            THE COURT:  Hold on one second.  I don't understand
5    the objection.
6            MR. BHACHU:  Your Honor, I would ask that he
7    establish the foundation about her knowledge of what
8    investigation the officers -- she did the salary calculations
9    -- we're working on.
10           THE COURT:  The exhibit is in evidence.  Does the
11   exhibit say that on its face?
12           MR. CLARK:  It does.
13           MR. BHACHU:  Well, could we have a sidebar, Judge?
14           MR. CLARK:  And she said it.
15           THE COURT:  Well, no.  But his objection is to
16   foundation, if that's the source of this.
17       (Sidebar proceedings had off the record.)
18           THE COURT:  The objection is sustained, ladies and
19   gentlemen.  Disregard the question and any answer that may
20   have been made or any implication of what the answer was by
21   virtue of the form of the question.
22   BY MR. CLARK:
23   Q.   What is this -- would you describe what this document
24   is?
25           What is this document?  You prepared it, am I

1    correct?

2    A.    I beg your pardon?

3    Q.    You prepared this document?

4    A.    Yes, I did.

5    Q.    And did you do this under the direction of someone?

6    A.    Yes.

7    Q.    And what is this document?

8    A.    It's a spreadsheet with all the officers that shows the

9    gross amount and the net amount of pay for the period

10   March 23rd through May 3, 2006.

11   Q.    That's your understanding in connection with this case?

12   A.    Yes.

13              MR. CLARK:  I have nothing further.

14              THE COURT:  Anything further, Mr. McFadden?

15              MR. MC FADDEN:  No, your Honor.  No further

16   questions.

17              THE COURT:  Ms. Bailey, you may step down.  Thank

18   you for coming in.

19         (Witness excused.)

20              THE COURT:  Do you have another witness, Mr.

21   McFadden?

22              MR. MC FADDEN:  Yes, your Honor.

23         The United States calls Larry Sachs.

24      LARRY SACHS, GOVERNMENT'S WITNESS, DULY SWORN

25              THE COURT:  Speak into that microphone, please.

                              DIRECT EXAMINATION

1

2    BY MR. MC FADDEN:

3    Q.    Mr. Sachs, could you state your name and spell it for

4    the jury and for the court reporter?

5    A.    Larry Sachs, S-A-C-H-S.

6    Q.    Who is your employer, sir?

7    A.    City of Chicago, Chicago Police Department.

8    Q.    How long have you been employed by the Chicago Police

9    Department?

10   A.    For about three-and-a-half years.

11   Q.    And what is your position with the police department?

12   A.    I'm the director of Grants Management.

13   Q.    Have you been in that position for the entire time that

14   you have worked for the police department?

15   A.    No.  For just a bit over one year.

16   Q.    And what was your position before you were the director

17   of Grants Management?

18   A.    I was a grants research specialist.

19   Q.    Was all that time within the same division of the City

20   of Chicago?

21   A.    Yes.

22   Q.    Is that the research and development division of the

23   city?

24   A.    Yes, it is.  Research and development division of the

25   Chicago Police Department.

Sachs - direct

1    Q.    Okay.  And were you employed by the Chicago Police

2    Department as a grants research specialist between -- during

3    the year of 2006?

4    A.    Yes.

5    Q.    Mr. Sachs, is the City of Chicago a municipal

6    corporation and a political subdivision of the State of

7    Illinois?

8    A.    Yes, it is.

9    Q.    Is the Chicago Police Department a law enforcement

10    agency of the City of Chicago?

11    A.    Yes, it is.

12    Q.    In your position, sir, have you had experience for

13    applying for money from the United States government for the

14    benefit of the Chicago Police Department?

15    A.    Yes, I have.

16    Q.    Does that include applying for grant money?

17    A.    Yes.

18    Q.    Would you estimate approximately how many federal grants

19    you have been involved with applying for in an average year?

20    A.    Probably 30 or 35 each year.

21    Q.    And specifically have you overseen or been involved with

22    the application of grants from the U.S. Department of

23    Justice?

24    A.    Yes, I have.

25    Q.    And within the Department of Justice, have you worked on

1  grant applications from the Justice Department's Office of

2  Justice Programs?

3  A.    Yes.

4  Q.    Is that also known as OJP?

5  A.    Yes.

6  Q.    And specifically, Mr. Sachs, are you familiar with the

7  Edward Byrne, B-Y-R-N-E, Justice Assistance Grant Program?

8  A.    Yes, I am.

9  Q.    Did the City of Chicago apply for that grant during the

10  2005-calendar year?

11  A.    Yes.

12  Q.    And how have you become familiar with that grant, sir?

13  A.    I saw the grant opportunity and coordinated a response

14  to that grant opportunity by the Chicago Police Department as

15  well as Cook County and 18 municipalities within Cook County

16  because we all had to sort of collectively apply for that

17  grant.

18  Q.    So you were involved with the application process

19  related to the Byrne grant?

20  A.    Yes.

21  Q.    Was the grant, in fact, awarded to the City of Chicago,

22  Mr. Sachs?

23  A.    Yes.

24  Q.    Approximately when during 2005 was it awarded?

25  A.    Late summer, early fall, maybe August or September

1    of 2005.

2    Q.    Okay.  And do you recall approximately how much money

3    was awarded as part of that grant?

4    A.    The grant award was $6,293,000.

5            MR. MC FADDEN:  May I approach the witness, your

6    Honor?

7            THE COURT:  Yes.

8    BY MR. MC FADDEN:

9    Q.    Mr. Sachs, I'm approaching you with a document marked as

10    Government Exhibit Grant Award.  Would you take a look at

11    that and let me know if you recognize that exhibit?

12    A.    Yes, I do.

13    Q.    What is that exhibit, sir, and how do you know?

14    A.    This is a typical grant award coming from the Department

15    of Justice, and it's an executed grant award, meaning that

16    it's been signed off on by the Department of Justice and by

17    the City of Chicago.

18    Q.    And let me specifically direct your attention to

19    Page 556.  In the bottom right-hand corner it's marked Box

20    No. 2, where it lists the project director, sir.

21            Are you the project director who is identified in

22    this grant, sir?

23    A.    Yes.

24    Q.    And this exhibit, Mr. Sachs, that you have in front of

25    you, is that the actual grant award from the Department of

1  Justice to the City of Chicago?

2  A.   Yes, it is.

3  Q.   Okay.  And these documents, were they created around the

4  time that the award was issued?

5  A.   Yes, they were.

6  Q.   And are they maintained in the normal course of business

7  by the City of Chicago?

8  A.   Yes.

9  Q.   And were they made in the regular course of business by

10 people involved with the grant application process?

11 A.   Yes.

12             MR. MC FADDEN:  Your Honor, I move to admit the

13 exhibit at this time.

14             THE COURT:  What are you calling that, Government

15 Exhibit Grant?

16             MR. MC FADDEN:  Grant Award.

17             THE COURT:  Any objection?

18             MR. CLARK:  No, your Honor.

19             THE COURT:  Government Exhibit Grant Award is

20 admitted.

21      (Said exhibit was received into evidence.)

22 BY MR. MC FADDEN:

23 Q.   Mr. Sachs, I have a few questions related to the award.

24 If we could start on Page 556, the page with your name on it,

25 sir.

1    Is there a project number that is listed on there,

2    sir?

3    A.    Yes, there is.

4    Q.    Tell the jury what that number is.

5    A.    It's 2005-dash DJ-BX-1256.

6    Q.    Is that number used to keep track of the award for

7    various purposes?

8    A.    Yes.

9    Q.    And does it identify -- do you see Box 3A, Title of the

10   Program?

11   A.    Yes.

12   Q.    What's the title of this program?

13   A.    The Edward Byrne Justice Assistance Grant Program.

14   Q.    And in Box 5 does it list the name and address of the

15   grantee?

16   A.    Yes.

17   Q.    And who is the grantee?  In other words, who received

18   this grant according to Box 5?

19   A.    City of Chicago.

20   Q.    And Box 9, does it list the amount of the award, sir?

21   A.    Yes, it does.

22   Q.    How much is that?

23   A.    $6,293,215.

24   Q.    Just to the right of that, in Box 10, does it list the

25   date of the award, sir?

1    A.    Yes, it does.

2    Q.    What is that date?

3    A.    August 19, 2005.

4    Q.    We'll come back to that in one minute, but if I could --

5    if I could first direct your attention to Page 550 earlier in

6    the packet, sir.

7    A.    Yes.

8    Q.    And directing your attention towards the bottom of the

9    page, Box Nos. 16 and 17.  What is reflected in those two

10    boxes?

11    A.    16 and 17 -- Box 16 lists the director of the branch of

12    the Department of Justice that made this award, and that is

13    his signature below that in Box 17.

14    Q.    Okay.  And in Box 18, does it say Grantee Acceptance?

15    A.    Yes, it does.

16    Q.    All right.  And does it list Richard Daley, Mayor?

17    A.    Yes.

18    Q.    And then there's a signature in Box 19 and a date.

19    First of all, what's the date?

20    A.    September 21, 2005.

21    Q.    And what does that reflect, that date, September 21st of

22    '05?

23    A.    That would be the date that the city officially signed

24    and accepted the award.

25    Q.    And the signature in there, does it say Richard M.

1   Daley?

2   A.   Yes, it does.

3   Q.   Now, if you know, was that the Mayor's signature or is

4   that somebody else acting --

5   A.   I believe because of the initials, that that is somebody

6   who is authorized to sign for the Mayor for grant

7   applications.

8   Q.   Is that -- in your experience, is that a standard way to

9   accept a grant, somebody else to sign with authorization?

10   A.   Yes, it is.

11   Q.   Now, Mr. Sachs, as part of your job duties, do you work

12   with individuals in the City of Chicago's comptroller's

13   office regarding grants that have been awarded to the city?

14   A.   Yes, I do.

15   Q.   How often are you in contact with people in the

16   comptroller's office about grants, sir?

17   A.   Several times a month I probably am in telephone

18   contact, and we're in e-mail contact more often than that.

19   Q.   At various times have you talked to people in the

20   comptroller's office about this grant specifically, the Byrne

21   grant?

22   A.   Yes.

23   Q.   And in September of 2005, when the grant was accepted by

24   the city, was there a person who was your point of contact in

25   the comptroller's office?

Sachs - direct

1    A.   Yes.

2    Q.   Who was that person, sir?

3    A.   A gentleman named Fletcher Neely.

4    Q.   Mr. Sachs, I'm approaching you with an exhibit that's

5    marked Government's Exhibit Wire Record.  If you could take a

6    look at that.

7              Please let me know if you recognize that exhibit

8    and how you recognize it.

9    A.   I do recognize this type of document.  I've seen it in

10   other files and I recognize this document specifically as

11   something that was sent to me upon my request by the

12   comptroller's office.

13   Q.   Does the comptroller's office maintain records of wire

14   transfers that show the receipt of federal grant money, Mr.

15   Sachs?

16   A.   Yes, they do.

17   Q.   This document here, are these documents maintained by

18   the City of Chicago and generated by people working for the

19   City of Chicago in the regular course of business?

20   A.   Yes, they are.

21   Q.   And, in fact, the first page of the document, does it

22   have the city's letterhead and logo on the left-hand side?

23   A.   Yes.

24   Q.   And directing your attention to Page 2, sir, is there a

25   stamp on there?

Sachs - Direct

1    A.    Yes, there is.

2    Q.    Could you read to the jury what the stamp is and tell

3    them what that signifies?

4    A.    It's a stamp that says, Received in the comptroller's

5    office of special accounting on February 22, 2006.  And that

6    would signify the date that office received this particular

7    piece of paper, which lists wire transfers to the City of

8    Chicago.

9                   MR. MC FADDEN:  Your Honor, I move to admit

10   Government's Exhibit Wire Transfer.

11                  THE COURT:  Any objection, Mr. Clark?

12                  MR. CLARK:  No, subject to cross examination, if I

13   may.

14                  THE COURT:  That will be admitted subject to cross.

15   If I don't hear an objection at the conclusion of your

16   cross-examination, it will be deemed to be admitted into

17   evidence.

18   BY MR. MC FADDEN:

19   Q.    Mr. Sachs, on the first page, what is the title of that

20   document?

21   A.    Receipt of Wire Transfer.

22   Q.    And is it prepared by Fletcher Neely, your point of

23   contact in the comptroller's office?

24   A.    Yes.

25   Q.    You said it was prepared by Mr. Neely, is that right?

1    A.    Yes.

2    Q.    And in the line where it talks about regarding, does it

3    say, letter of credit draw-down?

4    A.    Yes.

5    Q.    And does it then say, we have made a draw-down from the

6    following source, and does it identify the U.S. Department of

7    Justice?

8    A.    Yes.

9    Q.    And does it identify the amount of $6,293,000?

10   A.    Yes, it does.

11   Q.    And what is the date of that draw-down, sir?

12   A.    February 16th of 2006.

13   Q.    And please explain what a draw-down is based on your

14   experience working with federal grants?

15   A.    It literally is a transfer of funds from one source to

16   another, in this case from the U.S. Government to the City of

17   Chicago.

18   Q.    And directing your attention to Page 2 in this transfer

19   of funds, sir, towards the bottom of the page do you see the

20   -- do you see -- does it say name and then a colon, and then

21   does it say OJP?

22   A.    Yes.

23   Q.    And what does OJP signify, sir?

24   A.    Office of Justice Programs, the branch -- it's a branch

25   of the Department of Justice.

1    Q.   Does that document reflect again the amount of the award

2    that was received by the City of Chicago?

3    A.   Yes, $6,293,000.

4    Q.   Turning your attention to the last page of the document,

5    Mr. Sachs, in about the middle of the document does it say

6    remit and then does it have a colon?

7    A.   Yes.

8    Q.   And what do those letters and numbers to the right of

9    that signify to you, sir?

10   A.   It signifies the source of the funding that was

11   transferred to the City of Chicago and it is a grant award

12   number.

13   Q.   And could you read that number, please?

14   A.   2005 DJ-BX-1256.

15   Q.   Is that the same number as the project number that you

16   were referring to on Page 556 of the grant application

17   exhibit?

18   A.   Yes, it is.

19   Q.   I want to come back just to the specifics of the grant

20   for a minute, sir.

21        When that money is awarded to the City of Chicago,

22   is it supposed to be used by the Chicago Police Department

23   for certain purposes?

24   A.   Yes, although in this case, as I mentioned, we applied

25   on the behalf of the City of Chicago as well as Cook County

1    and other municipalities.  And it's considered a formula

2    award, meaning the amount for each entity was determined by a

3    federal formula.

4    Q.    And you said that you applied on behalf of various other

5    entities.  Were those other governmental entities within Cook

6    County?

7    A.    Yes.

8    Q.    Out of the $6.2 million that was applied for, how much

9    of that was retained and kept by the City of Chicago?

10   A.    A little bit over $4.2 million.

11   Q.    And then the other entities got approximately $2

12   million; is that fair?

13   A.    Cook County, a bit over a million, and the balance was

14   shared by the 18 municipalities.

15   Q.    And out of that $4 million in federal money that the

16   city received in February of 2006, was that designated for

17   any particular law enforcement purposes within the City of

18   Chicago?

19   A.    Yes, it was.

20   Q.    What were some of those purposes?

21   A.    We used this grant to replace worn out squad cars, worn

22   out computer equipment, worn out hand-held radios, and we

23   have a small amount that's dedicated toward our CAPS

24   operation, community service.

25   Q.    Is that what CAPS is, community service?

Sachs - direct

1    A.    Chicago Alternative Policing Strategy.

2                MR. MC FADDEN:  Thank you, sir.

3                I have no further questions.

4                THE COURT:  Cross?

5                        CROSS EXAMINATION

6    BY MR. CLARK:

7    Q.    Mr. Sachs, I note on the last page of this exhibit a

8    list of some 20 entities.  Were those the various

9    municipalities that were sharing in the grant?

10   A.    Yes.

11   Q.    And you gave a list of the uses of the grant.  And I

12   noted that -- were narcotics -- were narcotic -- the payment

13   of police officers' salaries included in the grant?

14               MR. MC FADDEN:  Objection; relevance.

15               THE COURT:  What is the relevance of this?

16               MR. CLARK:  Well, he asked what the grant was --

17   what the payments were for and I'm -- if there wasn't any for

18   police officers --

19               THE COURT:  Let me see you at sidebar.

20          (Sidebar proceedings outside the hearing of the jury:)

21               THE COURT:  The question, Ron, is:  Was any part of

22   a policeman's salary paid from this grant?

23               MR. CLARK:  Yes, any personnel, not necessarily --

24   no.  He wouldn't know that.

25               But what he's testified is that --

Sachs - cross

```
 1              THE COURT:  What's the question?
 2              MR. CLARK:  Did any of this go to personnel
 3    salaries.
 4              THE COURT:  But does that have anything to do with
 5    the jurisdictional requirement?
 6              MR. CLARK:  He says -- no, I'm not sure.  I'm
 7    honestly not sure of that.
 8              THE COURT:  What's the jurisdictional -- go ahead.
 9              MR. MC FADDEN:  The government just needs to show
10    that the money was received by the City of Chicago and that
11    it was for the benefit of the Chicago Police Department.  And
12    that's what --
13              THE COURT:  So that the agency of which the public
14    employee who was the recipient of the bribe, that that agency
15    received federal money.
16              MR. MC FADDEN:  It does not actually fall to the
17    subject matter of bribe --
18              THE COURT:  What difference does this make, Ron?
19              MR. CLARK:  It's not astronomical -- what
20    difference does it make?
21              THE COURT:  Does it make any difference?
22    Astronomical, infinitesimal or somewhere in between, what
23    difference does it make?
24              MR. CLARK:  Assuming he's right, which I think he
25    is right, not really.
```

1          THE COURT:  Okay.  Well, you can inquire as you

2    wish but --

3          MR. CLARK:  Let me just ask simply the question it

4    went to personnel, and if it's irrelevant, it's irrelevant

5    and I'm done.

6          THE COURT:  Okay.

7          Does he know the answer to this?  Is he going to

8    know where the money went?

9          MR. CLARK:  He said he asked where it went and he

10   said --

11         THE COURT:  No.  I mean, is he --

12         MR. MC FADDEN:  He's going to know that it was used

13   for personnel expenses generally.  I think he might tell you

14   that it was used, for example, to hire a grant administrator.

15         MR. CLARK:  I'm not going to pursue it.

16         THE COURT:  Okay.

17         MR. BHACHU:  Your Honor, for the record, we have

18   one more short witness who is going to be shorter --

19         MR. CLARK:  Actually, the third one he referred --

20         MR. BHACHU:  Very short, five minutes.

21         THE COURT:  Okay, five minutes tops.

22         Do you have any cross of this guy, the next one?

23         MR. CLARK:  A little foundational -- this one does,

24   in my opinion, require foundation.  And if there's not --

25         THE COURT:  Well, can we be done in ten minutes?